**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNLEASHED MAGAZINE, INC.,**

**Plaintiff,**

**-vs-**                                                    **Case No.  6:06-cv-1690-Orl-28GJK**

**ORANGE COUNTY, FLORIDA,**

**Defendant.**
_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration after oral argument on the following motion filed

herein:

| | |
|---|---|
| **MOTION:** | **DEFENDANT'S DAUBERT MOTION (AND MEMORANDUM TO EXCLUDE PLAINTIFF'S EXPERT (Doc. No. 39)** |
| **FILED:** | **May 12, 2008** |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

**BACKGROUND**

On October 31, 2006, Unleashed Magazine, Inc. (the "Plaintiff") filed an action for

trademark infringement and unfair competition pursuant to 15 U.S.C. § 1125(a) against Orange

County, Florida (the "Defendant").  Doc. No. 1.  Plaintiff has two applications for registered

trademarks pending before the United States Patent & Trademark Office.  Doc. No. 1 at ¶ 6.

Plaintiff's applications relate to marking the word "Unleashed" in two respects.  First, Plaintiff seeks to trademark the word "Unleashed" in connection with its magazine *Orlando Unleashed* for "printed publications, namely magazines, newsletters and books featuring information on pets, pet friendly places, and pet friendly establishments."  Doc. No. 1 at ¶ 6.  Second, Plaintiff seeks to register "Unleashed" in connection with "entertainment services in the nature of television programs featuring a wide array of topics about pets, animals and events and issues of interest relating thereto."  *Id*. at ¶ 7.   Plaintiff alleges that the Defendant's operation of the public television program *Pet Pals Unleashed* is infringing upon Plaintiff's trademarks.  Doc. No. 1.

On March 18, 2008, Plaintiff submitted the expert report of Rand Brenner.  Doc. No. 37-2.  Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), on May 12, 2008, Defendant filed the present Motion to Exclude Plaintiff's Expert.  Doc. No. 39.

**Mr. Brenner's Report**

Mr. Brenner's report contains a resume stating:

> I have had an extensive business career in the entertainment industry, where I held executive positions in the licensing divisions at Warner Bros. Consumer Products, Saban Entertainment and Geneon (Pioneer) Entertainment.   My expertise spans numerous high profile theatrical and television properties. . . .
>
> . . .
>
> During my tenure, I developed licensing and promotional agreements with major consumer products companies including Hewlett Packard, Kellogg's, Quaker Oats, Baudai, Hasbro, Mattel, Jakks Pacific, Random House, Harper Collins, Pillsbury, Topps, Upper Deck, Sara Lee/Hanes and others.  I remain active in the licensing industry as a consultant to consumer product companies seeking to expand their revenues through licensing.

Doc. No. 37-2 at 1.[1]   Regarding any publications, previous testimony as an expert witness, and

compensation, Mr. Brenner stated in his report that:

> I have not authored any articles in the preceding ten years, nor has
> he [sic] ever appeared as an expert witness in the preceding four
> years.  I will receive compensation in the amount of $100 per hour
> for his [sic] time in preparing this study and testimony.  Thus far, I
> have logged 12 hours on this project.

*Id*.[2]   Mr. Brenner's report is four pages in length and contains broad headings entitled: *Industry*

*Background*, *Value of the Trademark to the License*, *Trademark Dilution*, *Royalty Rates*, and

*Opinions*.  Doc. No. 37-2 at 2-3.  Under the heading *Industry Background*, Mr. Brenner generally

described the revenue streams and value of licensing magazine brands.  *Id*. at 2.[3]   Under the

heading *Value of the Trademark to the License*, Mr. Brenner described the value of licensing

magazine brand trademarks to television programs.  *Id*.[4]

Turning to *Trademark Dilution*, Mr. Brenner stated that it is "[a] major issue facing brand

owners. . . ." *Id*.  According to Mr. Brenner, trademark dilution "occurs when the use of a similar

---

[1] During Mr. Brenner's deposition on April 30, 2008, he stated that he is "a consultant to small business.  I work with businesses on buying and selling those businesses as well as consult manufacturers on licensing, products, and services."  Doc. No. 35-7 at pg. 8, lns. 13-15.

[2] Mr. Brenner stated at his deposition that he had never been accepted as an expert witness in any federal or state court.  Doc. No. 35-7 at pg. 14, lns. 12-17.

[3] "Sales of licensed products carrying the magazine brands that define America's culture helped to generate more than $41 million in licensing revenue in 2005. Magazines are using licensing to crate revenue streams and increase their visibility. . . . In particular, magazine titles that are focused on lifestyles or special interests (travel, cooking, etc.) can especially benefit from licensing, which can extend the magazine brand by increasing awareness within demographic areas that the magazine may not reach on a regular basis." Doc. No. 37-2 at 2.

[4] "Magazine branding may be one of the most effect ways to strengthen the relationship between the consumer and the brand.  A regular reader is exposed to the lifestyle and editorial vision of the magazine, thus creating a recognized, trusted brand. . . .  The value for a television program in licensing the use of the magazine trademark is an immediate recognition factor in the consumer market especially among the magazine subscribers.  An added benefit to the license for the television broadcaster is the magazine's 'shelf life,' meaning it remains continuously visible to the consumer on a monthly or weekly basis.  The television show can also reach a broader audience which helps expose the magazine brand to new customers and markets.  As the distribution of the magazine grows, its shelf life builds value

or identical trademark in other non-competing markets creates confusion in the consumer marketplace as to the single source origin of the trademark." *Id*.   Brenner reported that:

> . . . the unauthorized use of the trademark can negatively impact the mark in several ways: sales could start to decline if the consumers associate the trademark with unsafe or low quality products and services; by diminishing the owner's ability to license the brand to other third parties due to 'market confusion'.

*Id*. at 3 (citations excluded).   Mr. Brenner then compared the Defendant's *Pet Pals Unleashed* television program with Plaintiff's *Orlando Unleashed* magazine.  *Id.* at 3.

> Comparing the television show in question: *Pet Pals Unleashed*, to the magazine brand, *Orlando Unleashed*, I note: (1) a program title that includes all or part of the magazine's [sic] trademarked name; (2) an editorial focus that is very close if not identical to that of the magazine; (3) a television program that targets the same core demographic audience as the magazine; (4) a television program that is distributed via public broadcasting to the same local market in which the magazine is distributed.  Given these similarities, there could and can exist a perception by consumers and the business and advertising community that the television show and the magazine are interrelated (i.e. a licensing agreement or some other arrangement between the parties). Because there is a legal dispute between the parties over the rights to use the trademark name in question, the license is what is known as "dirty," a term used to describe a trademark surrounded in litigation.

*Id*. at 3.  Thus, Mr. Brenner's report concluded that trademark dilution could exist.

Regarding *Royalty Rates*, Mr. Brenner described the general forms they take and the general percentage of overall sales revenue created by royalty rates.  Doc. No. 37-2 at 3.

> Royalties can take the form of either flat fees for use of some or all editorial used, or it can take the form of a percentage of the licensee's overall sales revenues (Royalties generally range from 5% to 10% of total licenses revenues).   Generally, most licensing agreements are based on a set percentage or set dollar amount. There are a number of variations in royalty payment structures . . . .

_____

for the trademark through more exposure to potential new subscribers within the local market, benefiting both the licensor and licensee." Doc. No. 37-2 at 2 (citations omitted).

4

*Id*. (citation omitted).  Mr. Brenner then listed a number of the types of payment structures.  *Id*.

Mr. Brenner's final heading, *Opinions*, stated the following:

> Which payment structure is used is dependent on the particular licensee and revenue model.  In regards to this situation, a non royalty payment would not be appropriate for several reasons: (1) the show was a new program, and had not established either it's [sic] credibility or it's [sic] viewership audience within the market; (2) the magazine has an established recognition factor in the market from its base of paid and/or non paid subscribers and advertisers; (3) use of the magazine's trademark brand would associate the show with a recognizable brand within the market. Since the station is a non-profit entity that is not generating any revenues from sales of production services or advertising, the most appropriate royalty structure would be an annual royalty/use fee payment to be paid on a regular basis throughout the life of the agreement.
>
> . . .
>
> Royalty fees vary and are negotiated on a deal by deal basis.  While there are no hard and fast rules about fixed fees for television programs, the fee negotiations are based on a reasonable and fair amount for use of the trademark name.  For a non profit broadcaster, the annual use (programming) fee can range from $2,500 to 10,000.  **In my opinion, given the size of the market, program type, potential viewership, and use of trademark, without prior consent, an annual royalty payment of $7,500 would be a reasonable fee for the rights to use the magazine's trademark in the name of the television show**.  It should be noted that this fee would be specific to the station's local market only.  Rights to broadcast the show using the same name in other markets would require additional royalty fees to be negotiated based on the individual market, type of station (profit or non-profit) and duration of use.

*Id*. at 3-4 (citations omitted) (emphasis added).[5]

---

[5] The documents considered by Mr. Brenner when making his report were: the Complaint; the Answer; Defendant's Answers to Plaintiff's Interrogatories; an episode of Pet Pals Unleashed; the deposition of Kim Cousins, License Magazine, *2006 Annual Licensing Report*; Licensing Magazine, *103 Top Licensors*, April 2007; Business Week Magazine, *Magazines Circulate Their Brand Licenses*, July 21, 2006; The Trade Mark Revision Act of 2006; Folio Magazine, *Licensing Revenue Won't Just Come to You – How to Grow Licensing Income*, September 1, 2003; and Pioneer Public Television's 2006 Annual Programming Fee Budget.

**Mr. Brenner's Deposition**

On April 30, 2008, Mr. Brenner was examined by counsel for the Defendant.  Doc. No. 35-7.

<u>Training, Education, and Experience</u>

Mr. Brenner reported that he is a consultant to small businesses regarding the buying and selling of those businesses, licensing, and other services.  Doc. No. 35-7 pg. 8 lns. 13-15.  Mr. Brenner received his undergraduate degree from San Jose State University in field of advertising, and in 1979, he received a Master's in Business Administration from Pepperdine University.  *Id.* at pgs. 8-9 lns. 17-25, 1-2.  Mr. Brenner is not a licensed or certified accountant, but did take one accounting course as part of his MBA program.  *Id.* at pg. 9 lns. 1-24.    When asked if he was "qualified to express opinions regarding financial statements," Mr. Brenner responded after some clarification that he was not.  *Id.* at pg. 12 lns. 9-19.   Mr. Brenner stated that he has not authored any articles on the subject of licensing, and has never received any training on trademark licensing at a university or other institute, but had attended one seminar on trademark licensing and had lectured on licensing issues at seminars on numerous occasions.  *Id.* at pg. 10 lns. 22-25; pg. 11 lns. 1-25; pg. 12 lns 1-7.   Mr. Brenner was previously a member of Lemma Licensing Merchandisers Association, a licensing association, but has "never been certified or associated with any peer review organization where [his] peers evaluate[d his] opinions. . . ."  *Id.* at pg. 14 lns. 3-25; pg. 15 lns. 1-4.

Mr. Brenner stated that while he had "no formal training,"  regarding the allocation of income as a method for calculating of royalty rates, he considered himself a licensing professional qualified to render opinions regarding what a reasonable royalty rate would be based on his twenty

years of experience in the licensing industry.  Doc. 35-7 at pg. 13 lns. 16-21; pg. 14 ln. 25; pg. 15 lns. 1-11.  Mr. Brenner acknowledged, however, that he has never previously been engaged to render an opinion "with respect to the royalty rate that would be reasonable for an act of infringement of the trademark of a magazine."  *Id.* at pg. 24 lns. 11-22.

Mr. Brenner's Methods of Evaluation

Regarding whether Mr. Brenner had previously provided a formal opinion based on a hypothetical negotiation between a licensor and licensee, the following exchange occurred:

> **Q:**   Have you ever in connection with your experience, in developing licensing programs, rendered a formal opinion? In writing that purported to express an informed judgment about the royalty rate.  For a particular intellectual property asset, based on a hypothetical negotiation between a willing licensor and a willing licensee, in royalty negotiation?
> **Ms. Speth**:  Objection to form.
> **A:**   How do you define a formal opinion?
> **Q:**   In writing for your client to purport to express an informed judgment and explain the basis for that judgment in writing, based on a hypothetical negotiation between licensure and a licensee.
> **Ms. Speth:**   Objection to form.
> **A:**   Again I'm going to have to say a lot that is contained in a written documentation and discussions with the client about what I believe we can achieve from a business standpoint.  If you want to call that a formal opinion you could probably say that it is, but it is rendered for the purposes of determining what the potential business will be based on my experience working with those types of licensing programs on the market place.
> **Q:**   Do you know what the hypothetical royalty negotiation is?
> **A:**   A hypothetical royalty negotiation is a hypothetical situation.
> **Q:**   The question is have you purported to render an opinion in writing on a hypothetical royalty negotiation in order to arrive at a rate that a licensor and a licensee would have reached had they engaged in such negotiation at a point in time?
> **Ms Speth:**      That's been asked and answered three times.
> . . .

7

**A:**   Once again my business opinions are not rendered based on hypothetical assumptions.  They're based on experience with having dealt with specific types of licensing programs.

**Q:**   Do you understand what I'm talking about when I say an informal judgment based on a hypothetical negotiation at a point in time?

**A:**   I do understand that and as I stated my opinion would be based on my experience.  It would not be a hypothetical application on something that I have not done prior.  When I advised my clients it is based on experience having negotiated licensing agreements in whatever category we happened to be addressing at the time but it is purely a negotiation process.  So the projection is what we could possibly achieve but if you want to call that a hypothetical you can call that a hypothetical.

**Q:**   You never done that before have you?

**A:**   (No verbal response).

**Q:**   Where a client, lawyer, a business, somebody said, Mr. Brenner, I want you to write an opinion that would express an informed judgment on what a reasonable royalty would have been if "x" and "y" had had an negotiation before an act of infringement occurred?

**A:**   What I've been asked is in my opinion and judgment, what do my clients think could be negotiated for their respective trademark or copyright.

**Q:**   Is your answer to my question no, you never done that?

**A:**   You know, again, I'm going to have to say it depends on how you want to describe hypothetical.  If you're saying that my rendering my opinion, written – verbally based on my experience and projecting to my client is hypothetical than the answer is yes.

**Q:**   Do you know what the *Georgia Pacific* factors are?

**A:**   No, I do not.

Doc. No. 35-7, pgs. 17-20.  Mr. Brenner was then asked how he would make a "royalty licensing income" evaluation for a client such as a magazine that had been in business for three years.  *Id*. at pg. 21 lns. 3-17.  He responded: "I would sit with the client, evaluate the magazine, what potential categories we could go into and what types of licensing programs we might be able to develop and

what we might potentially be able to negotiate from the standpoint of royalties and/or guarantees."
*Id*. at lns. 19-23.

Mr. Brenner stated that he would need to know whether there was an "established market" and identification of the mark in the market place when working with the client on the potential royalty rate.  *Id*. at pg. 22 lns. 1-6.  According to Mr. Brenner, knowledge of the financial performance of the company or the intellectual property asset is not necessary to determine the potential for licensing that asset or determining a reasonable royalty rate.  *Id*. at lns. 18-25; pg. 23 lns. 1-6.

> Q.     Are you saying that you could reach a financial projection on a trademark without looking at the past performance of the branded item based on their financial statements?
>
> . . .
>
> A.     Yes, that's done.  That has what has been done and continues to be done, especially as it relates to entertainment content.
>
> Q.     Why would that not be rank speculation for you to make an opinion on the financial projection of income associated with the trademark, if you don't know anything about the past performance of that same business asset as a result of your financial statements?
>
> . . .
>
> A.     Well it's a projection.
>
> Q.     What's the difference between projection and speculation in that context?
>
> . . .
>
> A.     It's a question of how you define.  I think that experience in working in the industry and understanding of what has happened in the past and what could potentially occur provides some insight to be able to make a certain set of educated assumptions about what may occur with a new unproven property.

*Id*. at pg. 25 lns. 7-25; pg. 26 lns. 1-5.[6]  Mr. Brenner stated that he did not review Plaintiff's financial statements when rendering his opinion.  *Id*.

---

[6] After each question posed to Mr. Brenner above, counsel for Plaintiff objected as to the form of the question.

Mr. Brenner's Evaluation

Mr. Brenner acknowledged that he did not conduct a survey and no survey evidence was provided to him as part of his evaluation. *Id*. at pg. 40 lns. 21-25; pg 41 lns. 1. Mr. Brenner was asked the following questions regarding the source of his opinion that Orlando Unleashed had an established recognition factor in the market place:

> **Q.** In your report on page 3, you make a statement under Opinions, "The magazine has an established recognition factor in the market from its base of paid and/or non paid subscribers and advertisers. . . ." What is the source of that information?
> **A.** **My opinion**.
> **Q.** Other than just being your opinion are you able to document any source that will prove Orlando Unleashed has a recognition factor in the market from a base of paid and/or non paid subscribers and advertisers?
> **A.** Are you asking do I have a formal survey?
> **Q.** **Do you have any proof that backs you up**?
> **A.** **No.**

*Id*. at pg. 46 lns. 5-16 (emphasis added).   Mr. Brenner remarked that he did not know the number of paid subscribers of Orlando Unleashed. *Id*. at ln. 3.   However, Mr. Brenner stated that is was possible for the magazine to have a recognition factor in market place without any paid subscribers if there was a "controlled circulation distribution model." *Id*. at lns. 19-21.[7]   Mr. Brenner was then asked: "If the plan Unleashed Magazine, Inc., has almost no subscribers and almost no advertising revenue and has never earned a profit for any known reporting period **would there be any basis for inferring that it had an established recognition factor in the market**?" *Id*. at pgs. 48-49 lns. 24-25, 1-3 (emphasis added).   He responded: "**I don't know**. . . ." *Id*. at lns. 5-8 (emphasis added).

---

[7] According to Mr. Brenner, a controlled circulation distribution model is "[o]ne in which the magazine was distributed to whoever the target market but it was done on a non-paid basis and the revenue models one of

Mr. Brenner was asked if he knew what the circulation of the magazine was during the period of alleged infringement.  *Id*. at pg. 50 lns. 10-11.  He responded that: "Other than the information that I have read in [Kim Cousins'] deposition, I don't know."  *Id*. at lns. 12-13.

> **Q.**    What was the information that you had read in the depositions?
> **A.**    I believe if I recall it was somewhere in the neighborhood of about ten thousand.
> **Q.**    You were not supplied with any information on the distribution outlets.  Is that correct?
> **A.**    That's correct.
> **Q.**    You were not supplied with any information on readership.  That is to say who actually read the thing?  Is that correct?
> **A.**    That's correct.
> **Q.**    You were not supplied with any information on the depletion rate where the magazine was available for free, correct?
> **A.**    That's correct.
> **Q.**    You don't know if anyone read it, correct?
>                                             . . .
> **A.**    I don't know personally if anybody read it.
> **Q.**    Were you supplied with any evidence that anyone read it?
> **A.**    No.
> **Q.**    If you don't have any evidence that anyone is reading it and you don't know what the readership of the magazine is and you don't know what its circulation is, you don't know what it's advertising income is and you don't know what its subscription is and you do not have the detail of its controlled distribution model, how can you offer an opinion that it has an established recognition factor in the market place?
>                                             . . .
> **A.**    As I stated if the magazine is being distributed in a controlled distribution and the magazine is being depleted from its locations than unless somebody is throwing those magazines away, somebody is reading it and there's obviously awareness.
> **Q.**    **You don't know anything about its controlled distribution, do you?**
> **A.**    **Not specifics on the controlled distribution, no.**
> **Q.**    **Were you supplied with copies of the magazine?**
> **A.**    **No.**
> **Q.**    **Have you ever read it?**

---

generating revenue through advertising on the basis of that controlled circulation model."  Doc. No. 35-7 at pg 47 lns. 23-25.

**A.     No.**

*Id*. at pg. 50 lns. 14-25; pg. 51 lns. 1-25; pg. 52 lns. 1-4 (emphasis added).

Mr. Brenner was then asked what the basis was for his opinion that: "'Use of the magazine's trademark brand [by the television show *Pet Pals Unleashed*] would associate the show with a recognizable brand within the market.'"  Doc. No. 35-7 at pg. 52 lns. 5-8.  Mr. Brenner responded that the basis for his opinion was simply "[m]y opinion."  *Id*. at lns. 9.  He was then asked if there was any data to back up his opinion and Mr. Brenner responded that there was not.  *Id*.

> **Q.**     You don't know to what extent if at all there is a recognized brand within the market, do you?
> **A.**     I don't know how many people recognize the magazine.

*Id*. at pg. 52 lns. 12-14.

Finally, Mr. Brenner was asked about his ultimate opinion.

> **Q.**     In your final report on page 4 you made the statement in the middle of the paragraph, "In my opinion given the **size of the market**, **program type**, **potential viewership**, **and use of the trademark without prior consent** an annual royalty payment of $7,500 would be a reasonable fee for the rights to use the magazine's trademark in the name of the television show."  I want to ask you about that opinion.

Doc. No. 35-7 at pg. 55 lns. 13-19 (emphasis added).  Regarding Mr. Brenner's evaluation of the "size of the market," the following exchange occurred:

> **Q.**     What is the size of the market?
> **A.**     Demographically?
> **Q.**     What did you mean when you said [in your report] size of the market?
> **A.**     The general geographic area.
> **Q.**     Do you mean the size of Orange County?
> **A.**     No, the potential viewership.
> . . .

12

> **Q.** What is the potential viewership?
> **A.** It depends on the TV population.
> **Q.** What is the television population?
> **A.** I don't know the specific number.
> **Q. Did you have a specific matrix for the size of the market, what you call the size of the market?**
> **A. No.**

*Id*. at lns. 20-25; pg. 56 lns. 1-10 (emphasis added).

Concerning his evaluation of the "program type," Mr. Brenner stated that he did not rely on any data, but was "using program type . . . in the general sense." Doc. No. 35-7 at pg. 58 lns. 7-20. Similarly, the following exchange occurred regarding Mr. Brenner's evaluation of the potential viewership of *Pet Pals Unleashed*:

> **Q.** What is the potential viewership that you refer to?
> **A.** The potential viewership of the program.
> **Q. What is a potential viewership?**
> **A. The number of households that would tune into a program at any given time.**
> **Q. How many is that?**
> **A. I don't know. You have to get the ratings sources for that.**
> **Q. You have data on that?**
> **A. No.**
> **Q. You did not have any data on that when you rendered your opinion?**
> **A. That's correct.**

*Id*. at pg. 59 lns. 12-24 (emphasis added).

Pursuant to Local Rule 3.01(g) the parties conducted good faith conferences before and after the present Motion was filed. Doc. No. 61. As a result of the good faith conference, the Defendant supplemented its Motion in the following respects:

> The parties agreed to the following:
> a.     Mr. Brenner is not qualified to render an opinion as to whether there was or was not infringement.

13

      b.      Mr. Brenner is not qualified to render an opinion as to the existence
              of consumer confusion.

      c.      Mr. Brenner has no opinion on trademark dilution.

Doc. No. 61. The Motion is now limited to whether Mr. Brenner's report and his testimony are admissible regarding what would be a reasonable royalty rate for the Defendant's alleged unauthorized use of Plaintiff's mark. The Defendant seeks to have Mr. Brenner's expert report and expected testimony stricken based on the contents of the report and statements made by Mr. Brenner during the deposition because: (1) they do not satisfy the requirements of Rule 702, Federal Rules of Evidence; (2) Mr. Brenner is not qualified to render an opinion as to a reasonable royalty rate; and (3) Mr. Brenner's testimony will not assist the trier of fact. Doc. No. 39 at ¶ 5.

      Plaintiff's Opposition

      At the hearing, Plaintiff's counsel conceded that Mr. Brenner did not do well in deposition, but maintains his report and testimony would be helpful to the trier of fact and should be admissible.

**II.    THE LAW**

      Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principals and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Id.* In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the Supreme Court held that the trial court must perform a "gatekeeper" function designed to ensure that any and all expert testimony is both relevant and

reliable.  "The burden of laying a proper foundation for the admissibility of an expert's testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence."  *Hall v. United Ins. Co. of America*, 367 F.3d 1255, 1261 (11th Cir. 2004).  The party offering the expert has "the burden to show that his expert [is] 'qualified to testify competently regarding the matters he intend[ed] to address; [] the methodology by which the expert reache[d] his conclusions is sufficiently reliable; and [] the testimony [will] assist the trier of fact.'"  *McCorvey v. Baxter Healthcare Corp.*, 289 F.3d 1253, 1257 (11th Cir. 2002) (quoting *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001)).

In *Daubert*, the Supreme Court identified the following non-exclusive list of factors a court should consider when determining the admissibility and reliability of expert testimony:

1)  whether the expert's methods or techniques can be or have been tested;
2)  whether the technique, method, or theory has been subject to peer review and publications;
3)  whether the known or potential rate of error of the technique or theory when applied is acceptable; and
4)  whether technique, method, or theory has been generally accepted in the scientific community.

509 U.S. 579, 594-95 (1993).  In *Kumho Tire Co.*, the Supreme Court held that the *Daubert* factors applied not only to expert testimony based on scientific knowledge, but also to expert testimony based on general principles, technical knowledge, and other specialized knowledge.  526 U.S. 137, 141 (1999).  Nonetheless, the trial court's "gatekeeping" function "'inherently require[s] the trial court to conduct and exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702."  *U.S. v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *McCorvey*, 298 F.3d at 1257) (emphasis supplied).

15

In *U.S. v. Frazier*, the Eleventh Circuit addressed the admissibility of expert testimony based on experience and held:

> The Committee Note to the 2000 Amendments of Rule 702 also explains that "[n]othing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony."  Fed.R.Evid. 702 advisory committee's note (2000 amends.).  Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express.  As we observed in *Quiet Technology*, "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability . . . [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony."  326 F.3d at 1341-42. . . .  Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, **"[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.**  The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  Fed.R.Evid.702 advisory committee's not (2000 amends.)

387 F.3d at 1261 (emphasis added).  Thus, before admitting the opinion of an expert, the trial court is required to ensure that the expert's opinion, even if formed based on considerable experience and expertise, is supported by more than the expert's word and that there are "good grounds based on what is known."  *See Daubert*, 509 U.S. at 590.  Moreover, "[t]he *Daubert* requirement that the expert testify to scientific knowledge - - conclusions supported by good grounds for every step in the analysis – means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible."  *McClain v. Metabolife*, 401 F.3d 1233, 1245 (11th Cir. 2005); *see also Hudgens v. Bell Helicopters/Textron*, 328 F.3d

1329, 1344 (11th Cir. 2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion.").

### III.    ANALYSIS

The Court has reviewed the parties' briefs and arguments at the Motion hearing, and is otherwise fully apprised as to the issues herein.  The Court finds that this is classic case of being asked to "take the expert's word for it."  *Frazier*, 387 F.3d at 1261.   Mr. Brenner's ultimate opinions are: (1) a reasonable annual royalty rate would be the most appropriate remedy in this case; and (2) "given the size of the market, program type, potential viewership and use of the trademark without prior consent an annual royalty payment of $7,500 would be a reasonable fee . . . ."  Doc. No. 37-2.  However, Mr. Brenner's deposition clearly established that he developed no data, such as a survey, he reviewed no data, he made no measurable calculations, and has no more than a layman's knowledge of what the size of the market, program type, and potential viewership is of *Pet Pals Unleashed*.  Furthermore, after stating in his deposition that when calculating what a potential royalty rate may be he would need to know whether a magazine had an established market and recognition factor in the market place, Mr. Brenner acknowledged that he had no evidence indicating that Unleashed Magazine has a recognition factor in the market place.  Instead, Mr. Brenner relies solely on his experience for his opinion.  Not only is his ultimate opinion based on his experience alone, but the evaluation of the various factors and the inferences drawn from them leading to the ultimate opinion are themselves based solely on his opinion and experience without any reviewable supporting data or methods.  The Court cannot simply take Mr. Brenner's word for it that his considerable experience renders his opinion reliable.  Thus, the

17

Court finds that Mr. Brenner's report and expected testimony are not based on sufficient facts or data and are not the product of reliable principals and methods.[8]

**THEREON IT IS RECOMMENDED THAT:**

The Court strike Mr. Brenner's report and expected testimony pursuant to Rule 702, Federal Rules of Evidence.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on August 25, 2008.

GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy

---

[8] In its brief and at the hearing, the Defendant argued that a hypothetical royalty rate calculation was not an appropriate calculation of damages.  The Court finds it unnecessary to address this issue as the report and expected testimony should be stricken on other grounds.

18